**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 10-45664-MSH |
| MICHAEL J. SIMMONS | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE | ) | Adversary Proceeding No. 12-4035 |
| Plaintiff | ) | |
| v. | ) | |
| MICHAEL J. SIMMONS | ) | |
| Defendant | ) | |

**MEMORANDUM OF DECISION ON MOTION OF UNITED STATES TRUSTEE FOR PARTIAL SUMMARY JUDGMENT**

William K. Harrington, the United States Trustee for this region ("UST"), has moved for summary judgment on counts I and III of his complaint seeking an order denying Michael J. Simmons, the defendant here and the debtor in the main case, a bankruptcy discharge. Mr. Simmons opposes the motion.

**Facts**

The material facts are undisputed and are taken from those facts in the UST's statement of undisputed facts and those allegations in the complaint which Mr. Simmons admits are correct, from the transcript of Mr. Simmons' July 25, 2011, deposition taken by the trustee

1

pursuant to FED. R. BANKR. P. 2004 and from the schedules of assets and liabilities and statement of financial affairs ("SOFA") filed by Mr. Simmons in his bankruptcy case.

Mr. Simmons graduated from high school around 1995 and after a year or two of college at the University of Massachusetts Dartmouth, he quit in order to help an individual named Kai Kunz start a real estate business.[1] Mr. Simmons took a series of low-paying jobs, giving the money he earned to Mr. Kunz to help Mr. Kunz buy properties. Mr. Simmons trusted Mr. Kunz and for some period of time the two lived together.[2] Mr. Simmons' expectation was that at some point Mr. Kunz would reciprocate.[3] Mr. Simmons testified at his deposition that he does not know how much money he gave Mr. Kunz during this period.[4]

In 2006, with Mr. Kunz's assistance, Mr. Simmons began investing in residential rental properties.[5] Mr. Kunz would identify the properties and arrange financing for the various purchases by Mr. Simmons.[6] Mr. Simmons testified that while he frequently worked with Kelly O'Keefe, a real estate broker, in purchasing the various properties, it was Mr. Kunz who instructed him as to what properties to purchase.[7] Mr. Simmons took title to the properties in his

---

[1] Transcript of the July 25, 2011 FED. R. BANKR. P. 2004 examination of Michael J. Simmons ("Simmons Tr.") at 16-17, 20.

[2] *Id.* at 19 and 22.

[3] *Id.* at 21-22.

[4] *Id.* at 21.

[5] *Id.* at 32.

[6] Statement of Undisputed Facts at ¶ 30.

[7] Simmons Tr. at 29-30.

2

own name and executed the various loan documents, including mortgages, in connection with his purchases.[8] During 2006 and 2007 Mr. Simmons bought approximately 27 residential rental properties in Fitchburg, Gardner, Haverhill, Leominster, Northbridge (Whitinsville) and Worcester, Massachusetts.[9] Some of the properties were encumbered by second and even third mortgages. Mr. Simmons testified that Mr. Kunz told him "that was the way to go."[10] The properties were income producing but Mr. Simmons testified that the collection of rents was always handled by managers retained at Mr. Kunz's direction.[11] Mr. Simmons hired the managers, even signing contracts with at least two of them.[12] Each month the managers would collect rent and turn it over to Mr. Simmons.[13] Mr. Simmons testified that sometimes he received the money in cash[14] but he could not recall how much money he received.[15] He testified that there was no money left after the expenses of the properties were paid.[16] Mr. Simmons did not maintain a separate bank account for each property but had a "few" bank

---

[8] *Id.* at 32.

[9] Statement of Undisputed Facts at ¶ 31.

[10] Simmons Tr. at 50.

[11] *Id.* at 51.

[12] *Id.* at 50-56.

[13] *Id.*

[14] *Id.* at 58.

[15] *Id.* at 57.

[16] *Id.*

accounts that had low balances most of the time.[17] He also did not maintain separate ledgers for each tenant.[18] Mr. Simmons did not put all of the money he received from the properties into a bank account and could not recall which accounts he used when he made deposits.[19] Although Mr. Simmons' father is an accountant, there is no evidence that he enlisted his father's help with his record keeping.

On November 15, 2010, Mr. Simmons filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code seeking to discharge at least $3,424,554.13 in unsecured debt, almost all of which relates to the real estate he owns or owned. Prior to November 15, 2010, all but five of Mr. Simmons' properties had been sold; some by way of what Mr. Simmons described as "regular" sales, but most through short sales or foreclosures according to Mr. Simmons.[20]

On December 7, 2010, Mr. Simmons filed his schedules of assets and liabilities and his SOFA in support of his bankruptcy petition. Schedule I indicates that Mr. Simmons is unemployed and has no income while schedule J reflects expenses of $1,572.96 a month. Mr. Simmons lives with family members who provide for all of his household expenses.[21] Mr. Simmons has not amended any of the schedules or the SOFA.

---

[17] *Id.* at 57 and 65.

[18] *Id.* at 65.

[19] *Id.*

[20] *Id.* at 51.

[21] Statement of Undisputed Facts at ¶ 47. Mr. Simmons testified at his Rule 2004 examination in July 2011 that he was not employed at that time. Simmons Tr. at 13.

4

On Form B22A, the so-called means test, filed by Mr. Simmons in the main case, Mr. Simmons reported $314.29 in net rent and other real property income per month for the six months preceding the filing of his bankruptcy petition. His SOFA indicates "negative income" for 2008 (-$33,619.00) and 2009 (-$26,619.00) and no income for 2010.

On schedule A, Mr. Simmons listed ownership interests in five properties:

a. 107-111A Church Street, Unit 2, (Whitinsville) Northbridge, Massachusetts;[22]

b. 3-5 Johnson Street, Fitchburg, Massachusetts;

c. 50-60 Prichard Street, Fitchburg, Massachusetts;

d. 62-64 Prichard Street, Fitchburg, Massachusetts; and

e. 99-105 Church Street, (Whitinsville) Northbridge, Massachusetts.

Mr. Simmons' statement of intent filed with his schedules and SOFA indicates that he intends to surrender the five properties.

According to schedule A and the SOFA, the three Fitchburg properties have been in receivership since March 2010. In addition, Mr. Simmons' SOFA indicates that on November 10, 2009, he transferred a one-third interest in the three Fitchburg properties for no consideration to Mr. Kunz, who is described in the SOFA as a "business partner." The SOFA also reflects that at the same time, Mr. Simmons transferred to Mr. Kunz one-third interests in properties located at 348 Elm Street and 158 Prichard Street in Fitchburg for no consideration.

---

[22] Mr. Simmons owned three units that share the address of 107-111A Church Street in Whitinsville. According to Mr. Simmons' response to question 5 of the SOFA, Litton Loan Service apparently foreclosed or otherwise received possession of one of the units although the response simply identifies the property as "107-111A Chruch [sic] Street, Whitinsville, MA."

5

In addition to the real estate listed on schedule A, schedule B indicates that Mr. Simmons owns or owned a 100% membership interest in William T.C. XI, LLC ("T.C. XI"); a 25% membership interest in William XI Properties Series, LLC ("Properties Series") and "25% Stock" of Caleb Management Corporation ("Caleb Management"). According to the SOFA, T.C. XI and Properties Series are real estate holding companies while Caleb Management is a real estate management company. Mr. Simmons valued his interests in these entities at zero. His other personal property was valued at less than $1,500.00, including $5.00 in cash and a grand total of $10.35 held in five different bank accounts. On his SOFA Mr. Simmons indicated he rents a safe deposit box at the Bank of America which is empty.

The $3,424,554.13 in unsecured debts listed by Mr. Simmons in schedule F includes $3,236,768.85 which is described as deficiencies on various mortgages or deficiencies arising after foreclosure associated with multiple properties.[23] This amount appears to be in addition to

---

[23] The properties reflected on schedule F giving rise to deficiency liabilities are:

    a. 211-213 Park Street, Gardner, Massachusetts;
    b. 7-11 Glazier Street, Gardner, Massachusetts;
    c. 153 & 158 Prichard Street, Fitchburg, Massachusetts;
    d. 348 Elm Street, Fitchburg, Massachusetts;
    e. 66 Mechanic Street, Fitchburg, Massachusetts;
    f. 94 Daniels Street, Fitchburg, Massachusetts;
    g. 19 Ward Street, Worcester, Massachusetts;
    h. 107-111A Church Street, Units 1 and 3, Whitinsville, Massachusetts;
    i. 129 Elm Street, Fitchburg, Massachusetts;
    j. 215 & 217 Beacon Street, Worcester, Massachusetts;
    k. 69 & 71 Maywood Street, [no town listed];
    l. 32 Birch Street, [no town listed];
    m. 26-30 Crescent Street, [no town listed];
    n. 6-8 Marion Street, [no town listed];
    o. 74 Abbott Street, Gardner, Massachusetts
    p. 99 Church Street, [no town listed but presumably Whitinsville]; and
    q. 111 Church Street, [no town listed but presumably Whitinsville].

$884,215.91 which schedule D indicates is unsecured based on the values Mr. Simmons ascribes to the five properties he owned on the petition date. Schedule D also indicates that the total debt secured by the five properties on the petition date was $1,540,961.91.

On December 17, 2010, the UST requested Mr. Simmons to provide to him copies of certain documents related to his financial condition and business transactions, including bank account statements, canceled checks, and state and federal income tax returns. In response to the UST's requests, Mr. Simmons produced, among other things, copies of his federal income tax returns for the years 2007, 2008 and 2009. Each return included a schedule E which reports "Supplemental Income and Loss" from rental real estate. Each schedule E to the tax returns listed only one rental real estate property, a condominium unit located at 111 Church Street in Northbridge, Massachusetts, and for which gross income of $3,000, $6,000 and $11,400, respectively, was reported.

On July 25, 2011, Richard King, an assistant UST, conducted an examination of Mr. Simmons pursuant to FED. R. BANKR. P. 2004. Following the conclusion of Mr. Simmons' rule 2004 examination, Mr. King requested "rent rolls or ledgers evidencing the amount of rents collected from the various rental properties; an accounting of income earned and the disposition of proceeds, including bank statements and canceled checks; and copies of any financial statements or reports submitted to any lender . . . ."[24] Mr. King repeated his requests "several times over the next two years."[25]

---

[24] Updated Affidavit of Richard King, Esq. [docket #61] at ¶ 2.

[25] *Id.*

On April 13, 2012, the UST commenced this adversary proceeding seeking pursuant to Bankruptcy Code § 727(a)(3), (4) and (5) an order denying Mr. Simmons his discharge. The UST now seeks summary judgment in his favor on count I under § 727(a)(3) and count III under § 727(a)(5). Since the filing of the summary judgment motion, Mr. Simmons has produced to the UST additional records on three separate occasions. The records are not labeled or "organized in any meaningful fashion" according to Mr. King and his staff.[26] The documents do not show income received or the disposition of proceeds from Mr. Simmons' income property for the two year period prior to the commencement of his bankruptcy case.[27] Although Mr. Simmons states

---

[26] *Id.* at ¶ 4. *See also* Updated Affidavit of Sophia L. Selzo [docket #61] at ¶ 3 and Affidavit of Evelyn Rossi [docket #61] at ¶ 3.

[27] According to the updated affidavit of Sophia L. Selzo of the UST's staff, the records produced by Mr. Simmons included insurance binders and cancellation of insurance notices for some of the properties; inspection letters for repairs to be made to certain properties; an insurance binder for a 2002 BMW 3251 for policy year 7/3/07-7/3/08; an insurance proposal for Caleb Management; checks showing payments to McLaughlin Insurance Company; copies of some bank checks from Avidia Bank with no corresponding bank statements and not for the full two year period requested; snow removal receipts; list of rents collected for some of the properties and for less than the two year period requested; copies of purchase and sale agreements and HUD settlement statements for some of the properties purchased by Mr. Simmons; a copy of an 8/30/07 check in the amount of $27,000 and payable to "M. Simmons"; an 8/21/07 check from Prospect Investment, Inc. in the amount of $39,000 payable to "M. Simmons"; and miscellaneous receipts for purchases; documents relating to the purchase or lease of a BMW. According to the affidavit of Evelyn Rossi of the UST's staff, Mr. Simmons also produced copies of deposit slips from Digital Credit Union, Bank of America, Avidia Bank and Marlborough Savings Bank for some part of the two years prepetition but with no bank statements; a typewritten "money summary" apparently prepared by Mr. Simmons; copies of handwritten notes; a note signed by Michael Fronte "receiving $17,000"; copy of a $10,000 treasurer's check to "MPAT" (presumably the Massachusetts Property Assistance Trust) from Michael Simmons re: "Loan Modifications"; copies of a few rent checks; a copy of a record of a wire transfer from Morton Simmons' Fidelity Investment Account; email correspondence and wire instructions from Mr. Simmons to the Massachusetts Property Assistance Trust; various store receipts and notes; copies of closing documents for some of the properties owned by Mr. Simmons; various repair bills and receipts from Home Depot; real estate taxes and water and sewer bills for some properties; copies of court documents; certain insurance notices; and copies

by way of affidavit that he gave the UST all documents in his possession or that he could reasonably obtain and that he provided the UST's office with all bank statements which his name was on for the period of time requested by the UST, the UST maintains that comprehensive bank records were not produced.[28] The UST asserts that the documents produced do not provide an accurate and complete picture of Mr. Simmons' financial affairs and thus he continues to press for summary judgment.

### Jurisdiction

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). Venue is proper pursuant to 28 U.S.C. § 1409, because this proceeding is brought in the district where the bankruptcy case is pending.

### Discussion

<u>Summary Judgment Standard</u>

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (made applicable by FED. R. BANKR. P. 7056). A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences," could resolve in favor of the nonmoving party. *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 427 (1st Cir. 1996)). "Material" means that a disputed fact has "the

---

of canceled checks from Morton Simmons, Jr. .

[28] *See* Affidavit of Michael J. Simmons in Support of Opposition to Motion for Summary Judgment [#31].

potential to change the outcome of the suit" under the governing law if the dispute is resolved in favor of the nonmovant. *McCarthy v. Nw. Airlines, Inc.* 56 F.3d 313, 314–15 (1st Cir. 1995). The moving party bears the initial responsibility of informing the court of the basis for its motion and "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and . . . [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).

Bankruptcy Code § 727(a)(3)

A primary purpose of our federal bankruptcy system is to afford the honest but unfortunate debtor a financial fresh start through a discharge in bankruptcy. *See Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); *Bank of Boston v. Burr,* 160 F.3d 843, 847 (1st Cir. 1998). In furtherance of this goal courts generally have adopted a view that exceptions to discharge must be narrowly construed with all doubts resolved in favor of the debtor. *See, e.g.*, *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir. 1997); *Martin v. Bajgar,* 104 F.3d 495, 498 (1st Cir. 1997); *Century 21 Balfour Real Estate v. Menna,* 16 F.3d 7, 9 (1st Cir. 1994). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Boroff v. Tully* (*In re Tully*), 818 F.2d 106,

10

110 (1st Cir. 1987) (internal quotation marks omitted). But as the Supreme Court has noted "in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the [Bankruptcy] Act limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor." *Grogan*, 498 U.S. at 286-87 (internal citations and quotation marks omitted). "[T]he very purpose of certain sections of the law . . . is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Palmacci,* 121 F.3d at 786.

One of those sections, Bankruptcy Code § 727(a)(3), provides that the court shall grant a discharge unless, "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." *Peterson v. Scott* (*In re Scott*), 172 F.3d 959, 969 (7th Cir. 1999).

> The purpose of § 723(a)(3) of the Bankruptcy Code, and its predecessor, § 14(c)(2) of the Bankruptcy Act, is to ensure that dependable information is supplied to the Trustee and to creditors on which they can rely in tracing the Debtor's financial history. The Trustee and creditors are entitled to complete and accurate information showing what property has passed through the Debtor's hands during the period prior to his bankruptcy.

*Tucker v. Devine* (*In re Devine*), 11 B.R. 487, 488 (Bankr. D. Mass. 1981). *See also Scott*, 172 F.3d at 969. While the statute does not require flawless recordkeeping, a debtor must produce accurate written information from which his financial picture can be ascertained. *Id.*

The list of offending acts in § 727(a)(3) is stated in the disjunctive. A debtor who conceals *or* destroys *or* mutilates *or* falsifies *or* fails to keep *or* fails to preserve records necessary to present a complete financial picture without justification for such behavior runs

11

afoul of the section. And as the court in *Scott* emphasized, the words "keep" and "preserve" are not synonymous. Preserve means to retain a record after its creation. *Lassman v. Hegarty* (*In re Hegarty*), 400 B.R. 332, 342 (Bankr. D. Mass. 2008). "'[K]eep' has the same meaning it would have in phrases such as 'to keep a diary' or 'keep a record,' that is, to maintain a record by entering it in a book. Otherwise, the repetition of the word 'preserve' is superfluous, a disfavored result." *Scott,* 172 F.3d at 969 (citing *Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 837, n.11, 108 S. Ct. 2182, 100 L. Ed. 2d 836 (1988)).

As with other challenges to discharge, the plaintiff bears the burden of establishing a *prima facie* case by a preponderance of the evidence. *Grogan*, 498 U.S. at 286, 111 S. Ct. 654, 112 L. Ed. 2d 755, *CM Temporary Servs., Inc. v. Bailey* (*In re Bailey*)*,* 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007). This burden is not an onerous one and can be carried by evidence of the general nature of the debtor's business or personal affairs, the types of transactions for which documents are sought and how the missing documents *might* shed light on the debtor's financial condition. *Id.* "Congress' use of the word 'might' emphasizes its intended lack of rigor in the statutory standard. And the statute recognizes the practical reality that debtor is the gatekeeper of his or her own documents and information." *Strzesynski v. Devaul* (*In re Devaul*), 318 B.R. 824, 834 (Bankr. N.D. Ohio 2004). When determining the adequacy of records produced, the court can consider the debtor's education, business experience, sophistication, and the types of records typically preserved or kept in the particular business in which the debtor is engaged. *Bailey*, 375 B.R. at 415.

> In some cases, this may require opinion testimony by lay witnesses, Fed. R. Evid. 701, or qualified expert witnesses, Fed. R. Evid. 702. In others, the simplicity of the debtor's circumstances and the nature of the missing recorded information may be so basic as to allow the court to otherwise draw the conclusion on its own that

12

the missing records are inherently such that one 'might' be able to ascertain a debtor's financial condition or business transactions from them.

*Devaul*, 318 B.R. at 833-34.

Section 727(a)(3) allows a debtor to avoid the harsh consequences of failing to keep and maintain records by proving the failure justified.

> The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice.

*Meridian Bank,* 958 F.2d at 1231 (quoting *In re Wilson,* 33 B.R. 689, 692 (Bankr. M.D. Ga.1983)).

> It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies.
>
> Therefore, while a debtor may justify his failure to keep records in some cases, a discharge may be granted only if the debtor presents an accurate and complete account of his financial affairs.

*Razzaboni v. Schifano* (*In re Schifano*), 378 F.3d 60, 68 (1st Cir. 2004) (internal quotation marks and citations omitted).   In *Devaul* the court reviewed several circumstances in which courts have applied the justification standard:

> Applying this objective standard, courts have rejected a variety of justifications advanced under § 727(a)(3): small size of law practice, *Id.* at 1232; insufficient income to require filing of tax return did not justify failure to keep other records, *Strbac,* 235 B.R. at 884–85; tax protester's subjective belief that there is no obligation to file tax returns, *Hall,* 174 B.R. at 215; chemical dependency and gambling addiction, *Dolin,* 799 F.2d at 253; related entities are small and closely held, and underlying source documents all exist but are just disorganized, *Womble,* 289 B.R. at 858; records in possession of wife and others, *The Cadle Company v. Terrell,* No. 4:01–CV–0399–E, 2001 U.S.Dist. LEXIS 21944, 2002 WL 22075 (N.D.Tex. January 7, 2002); and lawyer's failure to pass bar exam and being made

13

president of company only because of family nepotism, *Wazeter,* 209 B.R. at 230–31.

Other debtors have simply failed to prove the following asserted justifications by a preponderance of the evidence: written records or oral testimony otherwise establish debtor's financial condition, *Krohn v. Frommann (In re Frommann),* 153 B.R. 113, 118 (Bankr. E.D.N.Y.1993) and *Colonial Bank v. Wynn (In re Wynn),* 261 B.R. 286, 303–04 (Bankr. M.D. Ala.2001); other physicians keep the records the same way, *Buzzelli,* 246 B.R. at 107–08; records were lost in moves or stolen in burglaries, *Id.* and *Shappell's Inc. v. Perry (In re Perry),* 252 B.R. 541, 548 (Bankr. M.D. Fla.2000); and mice ate records, *Costello,* 299 B.R. at 898.

Other courts have accepted the following justifications for a debtor's failure to keep records under the particular circumstances of the case: debtor wife reasonably relied on husband to keep records, *Cox,* 41 F.3d at 1298–1300; debtor running small concrete business was poorly educated, unsophisticated and had little business experience, *Eggert v. Sendecky (In re Sendecky),* 283 B.R. 760, 764 (8th Cir. BAP 2002); destruction of records not debtor's fault and debtor lacked ability or knowledge to establish or maintain bookkeeping system for real estate business, *Hunter v. Kinney (In re Kinney),* 33 B.R. 594, 596 (Bankr. N.D. Ohio 1983); self-employed debtor running gas station with very little formal education was justified in keeping records that were not "a paragon of clarity." *Energy Marketing Corp. v. Sutton (In re Sutton),* 39 B.R. 390, 398 (Bankr.M.D.Tenn.1984); medical problems arising from auto accident, *Benningfield,* 109 B.R. at 293; and unsophisticated businesswoman relied on bookkeeper to maintain books and records, *G & J Investments v. Zell (In re Zell),* 108 B.R. 615 (Bankr.S.D.Ohio 1989).

*Id.* at 837-38.

Bankruptcy Code § 727(a)(5)

Under Bankruptcy Code § 727(a)(5) a debtor may be denied a discharge if he "fails to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." The debtor's explanation must satisfy two concerns. "First, it must be supported by at least some corroboration. Second, the corroboration must be sufficient to eliminate the need for any speculation as to what happened to all of the assets." *Aoki v. Atto Corp. (In re Aoki),* 323 B.R.803, 817 (B.A.P. 1st Cir. 2005). A "discharge will be denied when a debtor makes only a vague evidentiary showing that the

14

missing assets involved have been used to pay unspecified creditors, or where the debtor fails to provide corroborative documentary evidence to confirm his explanation." *Id.*

Applying the Law to the Facts

Mr. Simmons disputes the UST's assertion that he failed to keep accurate records sufficient to give the UST and his creditors a clear picture of his finances for the period before and up to his bankruptcy petition date. In a seven sentence affidavit he says that he gave the UST everything he had or could reasonably recover from others who controlled the documents and that there is nothing more for him to give because he was not involved in the management of any of the properties. He claims that he was a "dupe to Mr. Kuntz and his associates."

Mr. Simmons' inability to document the income and expenses for the properties he owned, financed, retained individuals or entities to manage and for which he collected rents over a period of years is shocking and disturbing. The same is true for his inability to document the basis for being unable to pay the more than $4 million of debt he brings into his bankruptcy case.

It is only in the exceptional circumstance that I would deny a party his day in court to establish justification for his conduct, especially in a fact intensive inquiry involving discharge denial. But this is such a circumstance. I am not basing my decision on Mr. Simmons credibility or lack thereof. Taking Mr. Simmons at his word that he gave the UST all the records he had or could get his hands on and that he was merely a patsy for Mr. Kunz, his failure to have kept or maintained records that would establish a clear picture of his financial status prior to and on the date of his bankruptcy filing remains unjustifiable under the circumstances.

Mr. Simmons is a high school graduate with some level of college education. He dropped out of college for the very purpose of learning the real estate business from Mr. Kunz, with

15

whom he worked for many years. During the period prior to his bankruptcy Mr. Simmons owned at least 27 pieces of real estate, borrowing millions of dollars in connection with these properties. If Mr. Simmons was so foolish or naïve as to think that because he was acting as a shill for Mr. Kunz he would be excused from the basic responsibilities imposed on any owner of real estate, he must unfortunately be required to suffer the consequences of his poor judgment. Mr. Simmons' choice to act as Charlie McCarthy to Mr. Kunz's Edgar Bergen no more justifies his inability to account for the operation of the real estate he owned and the losses he claims to have incurred than would it excuse his failure to comply with the municipal health and safety codes imposed upon him as a landlord.

**Conclusion**

Because Mr. Simmons failed without justification to keep and maintain complete and accurate financial records or to present any corroborating evidence from which the UST, his chapter 7 trustee or creditors could satisfy themselves as to his financial condition, business transactions or the losses he incurred, I will grant the UST's motion for summary judgment as to counts I and III of his complaint.

A separate judgment will enter denying Mr. Simmons' discharge pursuant to Bankruptcy Code § 727(a)(3) and § 727(a)(5).

At Worcester, Massachusetts this 18th day of July, 2014.

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   Richard S. King, Esq.
Assistant United States Trustee
Worcester, MA
for plaintiff William K. Harrington, United States Trustee

James Ehrhard, Esq.
Worcester, MA
for defendant Michael J. Simmons